**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WILLIAM COPELAND,　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　Plaintiff,　　　　　　　) | **No. 20 C 4451** |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　v.　　　　　　　　　　　　　　　) | **Judge Rebecca R. Pallmeyer** |
| 　　　　　　　　　　　　　　　　　　) | |
| SOO LINE RAILROAD CO. d/b/a　　　) | |
| CANADIAN PACIFIC, SMART-TD/UTU　) | |
| LOCAL 1433, SMART-TD GENERAL　　) | |
| COMMITTEE OF ADJUSTMENT GO-261,　) | |
| and INTERNATIONAL ASSOCIATION OF　) | |
| SHEET METAL, AIR, RAIL AND　　　) | |
| TRANSPORTATION WORKERS,　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　Defendants.　　　　　　) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Copeland brings this hybrid action against his employer and his union under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). Copeland alleges that Soo Line Railroad Company, d/b/a Canadian Pacific ("CP/Soo") breached its collective bargaining agreement with Plaintiff's union by terminating him without good cause. He further alleges that the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART" or "the International"), the SMART Transportation Division ("SMART-TD") General Committee of Adjustment GO-261, and SMART-TD Local 1433 (collectively, the "Union Defendants") breached their duty of fair representation by mishandling a grievance following his termination. Before the court are two motions: (1) a motion by the International and Local 1433 to dismiss this case for failure to state a claim, and (2) a motion by CP/Soo to dismiss the case for lack of subject-matter jurisdiction and failure to state a claim. For the reasons provided below, the court grants the Union Defendants' motion [36] and dismisses the International and Local 1433 as Defendants in this case. The court also grants CP/Soo's motion [38] and dismisses Count I of the Second Amended Complaint.

**BACKGROUND**

At this stage of the proceedings, the court accepts the factual allegations in the Second Amended Complaint ("SAC") as true. Copeland has worked as a train conductor with CP/Soo in Franklin Park, Illinois since 2004. (SAC [31] ¶¶ 5–6.) He is a member of Local 1433, an affiliate of SMART International. (*Id*. ¶ 14.) Both Local 1433 and SMART are named as Defendants. Also named is the General Committee of Adjustment GO-261 ("GCA 261"), an intermediate organization within the International. (*Id*. ¶¶ 10–12.) GCA 261 "shares representation and negotiation duties" with approximately 12 locals "[in their] dealings with the employers of [their] members,"[1] including disputes between Local 1433 members and CP/Soo. (*Id*. ¶¶ 11, 13.) The International "maintains a constitution . . . governing virtually all aspects of these subunits." (*Id*. ¶ 9.) Plaintiff pays dues to all three organizations—Local 1433, GCA 261, and SMART International. (*Id*. ¶ 14.)

On May 13, 2017, CP/Soo terminated Copeland for allegedly failing to report another conductor's unauthorized use of an electronic device in violation of the General Code of Operating Rules ("GCOR"). (*Id*. ¶ 15 (citing GCOR 1.4 (duty to report) and 2.21 (electronic devices)).)[2] Plaintiff and Engineer Grace Kocur were on a train with Conductor Eric Rodriguez when Rodriguez allegedly used his cell phone (a violation of GCOR 2.21), and both Copeland and Kocur

---

[1]     The Union Defendants dispute this allegation, arguing that the International's Constitution "vests such representation and negotiation duties *exclusively* with the GCA." (Union Mem. [37] at 7 (emphasis in original) (citing SMART Constitution, Ex. A to Union Mem. [37-1] at Article 21B, Section 85 ("Duties of General Committees of Adjustment")).) The court may consider the SMART Constitution without converting Defendants' motion into a motion for summary judgment because the document is referenced in the complaint (*see* SAC ¶ 9) and is central to Plaintiff's claim. *See Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). That being said, it is unclear what language in the Constitution vests *exclusive* authority with General Committees, as opposed to locals, for representation and negotiation. (*See* SMART Constitution at Article 21B, Section 85: 3–9 ("General Committees of Adjustment shall have authority to make and interpret agreements with representatives of transportation companies . . . [and] shall investigate all matters properly submitted to them . . . .").)

[2]     The court is uncertain of the source of these rules, but it appears they have been adopted by a number of railroads. Plaintiff has not challenged their enforceability.

were terminated for their failure to report Rodriguez's violation to CP/Soo. (*Id*. ¶ 17.)[3] CP/Soo also terminated Rodriguez but later reinstated him under a leniency agreement. (*Id*. ¶ 16.) Kocur, who belonged to Local 790 of the Brotherhood of Locomotive Engineers and Trainmen, filed a grievance that proceeded to arbitration. (*Id*. ¶¶ 18–19.) The Public Law Board ("PLB") determined that Conductor Rodriguez had used his cell phone during a designated meal break, and because there was no violation of GCOR 2.21, Kocur had no duty to report under GCOR 1.4.[4] (*Id* ¶ 19.) Kocur was reinstated and received a "make-whole remedy," including backpay, retirement credits, and benefits. (*Id*.)

Copeland's circumstances were "identical" to Kocur's, but Copeland's union did not achieve the same outcome for him. (*Id*. ¶ 20.) Local 1433 filed a grievance in August 2017 contesting Plaintiff's termination as a violation of the collective bargaining agreement ("CBA").[5] (*Id*. ¶ 21.) The Union properly pursued the grievance through the first two stages of the grievance process, and CP/Soo denied the grievance at both stages. (*Id*. ¶ 23.) Local 1433 and GCA 261 "jointly shared responsibility for the prosecution and progression of Plaintiff's grievance." (*Id*. ¶ 26.) On April 12, 2018, CP/Soo "unilaterally" reinstated Plaintiff—evidently not as a result of the union's advocacy; CP/Soo characterizes the reinstatement as "an exercise of managerial leniency." (CP/Soo Mem. [39] at 2.) But CP/Soo refused to provide a make-whole remedy, so

---

[3]  The SAC does not specify the date of this incident.

[4]  Defendant CP/Soo argues in its brief that Rodriguez "admitted" to violating GCOR 1.4 and 2.21, and that this admission "conclusively establishes Plaintiff's own rule violations for failing to report Rodriguez's rule violations." (*See* CP/Soo Mem. [39] at 3 n.3 (citing Rodriguez Leniency Reinstatement Agreement, Ex. M to Dittrich-Bigley Decl. [40-13]).) Plaintiff objects that this exhibit contradicts Plaintiff's allegation in the SAC that Rodriguez was using his cell phone during a designated meal break. (Pl.'s Opp'n to CP/Soo [43] at 4.) The court sustains Plaintiff's objection and will not consider the exhibit in its analysis below.

[5]  The Union Defendants have attached an excerpt of the CBA to their brief. (*See* Agreement Between CP/Soo and SMART-TD of 4/6/17 (hereinafter "CBA"), Ex. B to Union Mem. [37-2].) Defendant CP/Soo has also attached a complete version of the CBA to a declaration accompanying its brief. (*See* CBA, Ex. C to Dittrich-Bigley Decl. [40-3].)

Copeland's grievance proceeded to arbitration. (SAC ¶¶ 24–25.) The General Chairperson of GCA 261, then Matt Marschinke, whose duty it was to "list" Copeland's grievance for arbitration, failed to do so before the August 21, 2018 deadline. (*Id*. ¶¶ 27–28.) Instead, Marschinke did not list the grievance for arbitration until April 26, 2019 (*id*. ¶ 29), and the hearing took place before the PLB on December 20, 2019. (*Id*. ¶ 36.) Plaintiff's presence at this hearing was neither requested nor required. (*Id*. ¶ 38.) On April 17, 2020, the PLB issued its opinion denying Copeland's grievance, allegedly because of the missed filing deadline.[6] (*Id*. ¶¶ 34–35.)

According to Copeland, he first learned about the missed filing deadline on April 27, 2020 in an email from Gerald Wallace, the new GCA 261 General Chairperson. (*Id*. ¶ 46.) Copeland alleges that during his tenure as General Chairperson, Marschinke "missed deadlines or botched the grievances of at least four other Soo Line employees and SMART union members." (*Id*. ¶ 30.) In fact, Plaintiff alleges, at the time of Copeland's grievance, Marschinke "had largely abandoned his duties" as General Chairperson. (*Id*. ¶ 31.) Plaintiff filed charges against Marschinke, as authorized by the SMART Constitution, but the International notified Copeland on July 28, 2020 that it would not pursue his charges further. (*Id*. ¶ 47.)

Plaintiff alleges that "reasonably relied" on Local 1433 and GCA 261 to process his grievance in a timely fashion. (*Id*. ¶ 22.) He asserts, on information and belief, that GCA 261, the International, and CP/Soo "were all aware" that Marschinke had mishandled four other union

---

[6] CP/Soo has attached exhibits showing that it reinstated Kocur on April 25, 2018, her grievance timely proceeded to arbitration, and the PLB reached a decision on October 10, 2018. (CP/Soo Mem. at 5 n.5 (citing Kocur Reinstatement Letter, Ex. J to Dittrich-Bigley Decl. [40-10]; PLB Kocur Decision, Ex. A to Tews Decl. [41-1]).) CP/Soo emphasizes that because Kocur's PLB decision came after the August 21, 2018 deadline to list Plaintiff's grievance for arbitration, CP/Soo had no way of knowing that Kocur would ultimately succeed at arbitration. (CP/Soo Mem. at 5 n.5.) These facts contradict Plaintiff's allegation that CP/Soo acted in bad faith by forcing him to litigate this matter "with full knowledge of the PLB decision in the identical Kocur matter." (SAC ¶ 52.) Setting aside the propriety of considering these exhibits on a motion to dismiss, the court notes that the precise timeline of Kocur's arbitration process is ultimately irrelevant to the court's resolution of CP/Soo's motion to dismiss. More importantly, regardless of how Kocur's grievance was resolved, Plaintiff was entitled to challenge his own termination, as well as his union's alleged delay in pursuing his grievance.

4

members' grievances. (*Id.* ¶ 42.) At some point, General Chairperson Wallace "communicated with" a SMART-TD International Vice President "about Plaintiff's situation." (*Id.* ¶ 43.) Plaintiff does not say whether there was any response to this communication, but he alleges that GCA 261 and the International "failed to take timely action to correct or address this problem" (presumably a reference to Marschinke's failures). (*Id.* ¶ 44.)

Plaintiff asserts that he maintained email communication with Marschinke and Wallace from the beginning of the grievance process until the PLB's decision, requesting status updates and asking if the Union needed anything from him. (*Id.* ¶ 45.) Marschinke and Wallace responded in ways that led Copeland to believe "that the grievance was on track and moving forward, and that there was nothing further that Plaintiff needed to do." (*Id.*) Instead, because of the Union's "arbitrary handling of Plaintiff's grievance," Copeland was denied a make-whole remedy from the PLB. (*Id.* ¶ 35.) Plaintiff notes that the PLB's opinion stated that the Union and CP/Soo had reached a settlement in Plaintiff's case (*id.* ¶ 39), but he was unaware of and did not participate in a settlement.[7] (*Id.* ¶ 40.) Plaintiff still has not received backpay, retirement credits, and other benefits that he would have received for the eleven months from his termination to the date of his reinstatement. (*Id.* ¶ 41.)

Plaintiff filed this suit on July 29, 2020, bringing four counts against CP/Soo and the Union Defendants under the RLA. Count I alleges that CP/Soo breached the CBA by terminating him without good cause and then "[taking] advantage of, and [being] complicit in, the subsequent

---

[7]    CP/Soo asks the court to take judicial notice of the PLB's decision. (*See* CP/Soo Mem. at 6 n. 7 (citing Copeland PLB Decision, Ex. B to Tews Decl. [41-2]).) Because Plaintiff has not challenged the authenticity of the document, the court is free to do so. *See* FED. R. EVID. 201(b)(2); *Skiba v. Ill. Cent. R.R. Co.*, No. 19 CV 2267, 2020 WL 1330651, at *1 n.2 (N.D. Ill. Mar. 23, 2020) (taking judicial notice of PLB documents in an RLA case). That being said, both CP/Soo and Plaintiff seem baffled by the PLB's reference to Plaintiff having been "reinstated after the case was recently settled." (Copeland PLB Decision at 2.) CP/Soo disputes that it "settled" Plaintiff's grievance in any way other than reinstating Plaintiff as an act of leniency. (*See* CP/Soo Mem. at 6 n.6.) Plaintiff similarly denies being aware of or participating in any settlement, alleging that "[t]he exact date, location, and terms of any such settlement remain unknown to Plaintiff." (SAC ¶ 40.) The court assumes for purposes of this opinion that there was no settlement of Plaintiff's claims against CP/Soo.

failure of the [Union Defendants] to uphold their duty to represent Plaintiff." (*Id.* ¶ 51.) Count II alleges that Local 1433 breached its duty of fair representation ("DFR") by handling Plaintiff's grievance in an arbitrary fashion and failing to keep him informed about the status of his grievance and arbitration. (*Id.* ¶¶ 57–58.) Count III similarly alleges that GCA 261 breached its DFR to Plaintiff. (*Id.* ¶¶ 64–65.) Finally, Count IV alleges that the International breached its DFR to Plaintiff by handling his grievance in an arbitrary fashion and failing "to take timely action to correct or address" Marschinke's past lapses in pursuing grievances on behalf of other union members. (*Id.* ¶¶ 71–72.)

## **LEGAL STANDARD**

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a complaint must contain "enough factual matter (taken as true)" to suggest that a plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). By contrast, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Courts generally "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

A motion to dismiss under FED. R. CIV. P. 12(b)(1) challenges the existence of subject-matter jurisdiction. The party invoking federal jurisdiction bears the burden of establishing that jurisdiction is proper. *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015). When a defendant challenges the sufficiency of the allegations concerning subject-matter jurisdiction, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Remijas*, 794 F.3d at 691; *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009) (distinguishing between facial challenges and factual challenges to subject-matter jurisdiction); *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th

6

Cir. 2015) (stating that "when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)").[8]

## DISCUSSION

Two motions to dismiss are pending. The Union Defendants seek dismissal of the International and Local 1433 under FED. R. CIV. P. 12(b)(6). CP/Soo also seeks dismissal on statute of limitations grounds and for lack of subject-matter jurisdiction under FED. R. CIV. P. 12(b)(1).

## I. The Union Defendants' Motion to Dismiss

The Union Defendants seek dismissal of Plaintiff's claims against the International and Local 1433 on the basis that they are not proper parties to this suit. They emphasize that SMART-TD has a three-tiered structure: "(1) the International, which functions as the administrative head of the union, (2) GCAs, which are semi-autonomous mid-level bodies that are responsible for negotiating and enforcing the respective CBAs under their jurisdiction, and (3) locals, where membership is held." (Union Mem. [37] at 2 (citing *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 973 F.3d 326, 332 n.3 (5th Cir. 2020) (accepting this three-tiered framework); *Gen. Comm. of Adjustment, GO-386 v. BNSF Ry. Co.*, 295 F.3d 1337, 1339 (D.C. Cir. 2002) (noting that GCAs are "authorized by the union constitution to deal with grievances").) Defendants contend that any acts or omissions constituting a DFR breach are attributable solely to GCA 261, not the International or Local 1433. They also note that the CBA between CP/Soo and the Union designates the "General Committee" as the Union's "duly

---

[8]     By contrast, if a defendant challenges the factual basis for federal jurisdiction, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444 (citations omitted). Defendant CP/Soo argues that its challenge to subject-matter jurisdiction is not "*solely* facial" (CP/Soo Reply [46] at 3 n.2 (emphasis in original), but the court explains below that the allegations in the SAC are sufficient to determine whether this case is properly in federal court.

accredited representative" (CBA at Article 3(D)), and that the General Chairperson has the authority to appeal grievances. (*See* CBA at Article 28, Section 2(C), (D), (G), Section 3(B), (C); *see also* SMART Constitution, Article 21B, Section 85 (discussing the duties of General Committees of Adjustment).)

Only exclusive bargaining representatives owe a duty of fair representation to union members.[9] *See Vaca v. Sipes*, 386 U.S. 171, 177, 182 (1967); *Grant v. Burlington Indus.*, 627 F. Supp. 311, 313 (N.D. Ill. 1985) (collecting cases); *see also Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2469 (2018) (observing that the "duty [of fair representation] is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit"). "When an entity is neither the bargaining representative for an employee nor a party to the collective bargaining agreement under which the employee receives her or his rights then it clearly cannot serve as the employee's exclusive representative and should not be subject to the fair representation duty." *Grant*, 627 F. Supp. at 313. Because the CBA designates GCA 261 as Plaintiff's exclusive bargaining representative, Defendants argue, the International and Local 1433 do not owe Plaintiff a DFR and cannot be liable for breach of DFR.

Plaintiff responds that the International, not GCA 261, is the exclusive bargaining representative with CP/Soo because the CBA does not specifically identify "General Committee of Adjustment GO-261" or "GCA 261" as such. (Pl.'s Opp'n to Union [44] at 3, 6.) Instead, the CBA contains generic references to the "General Committee." (*See, e.g.*, CBA at Article 3(D).)

---

[9]        *But see Chavez v. United Food & Com. Workers Int'l Union*, 779 F.2d 1353, 1357 (8th Cir. 1985) (cautioning that this general statement of the law, while accurate, "does not mean that a union may never be held to some duty of fair representation where a majority of employees have designated the union as their bargaining agent, the union has accepted that designation and has attempted to bargain on their behalf but has failed to represent them fairly in the process"). Because Plaintiff has not alleged that either the International or Local 1433 falsely held itself out as his exclusive bargaining representative, however, this exception to the general rule does not apply. *See id.* at 1359 (affirming dismissal of international because there was no evidence that it represented itself as union members' exclusive bargaining representative).

The court agrees that the CBA is not a model of clarity in this regard: The cover page of the CBA designates the agreement as one between CP/Soo and "Its Trainmen Represented by Transportation Division of SMART," and the CBA states that "[t]he term 'Union' or 'General Committee' shall mean the Transportation Division-Sheet Metal Air Rail and Transportation (SMART-TD)." (CBA at 1; *id*. at Article 3(B).)

The court notes, however, that the CBA is signed by "Matt Marschinke, General Chairperson" of GCA 261. (*See id*. at 52.) And the CBA goes on to say that "[t]he General Committee of Adjustment of the SMART-TD[] will represent all Trainmen in the making of contracts, rates, rules, working agreements and interpretations thereof." (*Id*. at Article 28, Section 1(B).) These circumstances confirm that references to the "General Committee" are shorthand for GCA 261, and that GCA 261 is in fact the exclusive bargaining representative. (*See also* CBA at Article 3(D) (stipulating that the term "'duly accredited representative' . . . shall be understood to mean the regularly constituted General Committee").) If "General Committee" were truly synonymous with "SMART-TD" (meaning the International), then the phrase "SMART-TD General Committee" in Article 28, Section 1(C) would be superfluous.[10] The fact that the CBA was "approved" by an unnamed Vice President of SMART-TD does not mean that the International, rather than GCA 261, is the exclusive bargaining representative. *See Borg v. Greyhound Lines,*

---

[10]     Plaintiff argues that the CBA contemplates different meanings for "General Committee" and "General Committee of Adjustment" because the latter only appears once in the entire CBA. (Pl.'s Opp'n to Union at 7 ("[R]eferences to 'SMART-TD', 'Union', or 'General Committee' do not pertain to the General Committee of Adjustment, because the document plainly uses the actual term 'General Committee of Adjustment' when that is the intended reference.").) But Plaintiff's reading does not explain why the drafters would have used the term "General Committee" at all if references to "General Committee" are interchangeable with "the International," as he suggests. And even if "General Committee" and "General Committee of Adjustment" have materially different meanings in the CBA, Plaintiff cannot escape the plain language of Article 28, Section 1(B), which states that "[t]he General Committee of Adjustment . . . will represent all Trainmen in the making of contracts, rates, rules, working agreements, and interpretations thereof." The absence of the word "exclusive" is immaterial (*see* Pl.'s Opp'n to Union at 8), because the provision states that the GCA will represent "all Trainmen" in the collective bargaining process. (CBA, Article 28, Section 1(B).)

*Inc.*, No. C 83-4827 RHS, 1984 WL 14332, at *3–4 (N.D. Cal. July 1, 1984) (holding that international union did not owe a DFR to plaintiff even though the international's vice president signed the CBA); *accord Carr v. Loc. Union 1593, Int'l Bhd. of Elec. Workers*, 371 F. Supp. 2d 1097, 1104–05 (D.N.D. 2005) (holding that international union owed no DFR even though a representative of the international took part in negotiations at which the local was the exclusive bargaining representative).[11]

The court concludes that the Union Defendants' interpretation of the CBA—that GCA 261 is the exclusive bargaining representative—is correct.[12]   Because the International and Local 1433 are not Plaintiff's exclusive bargaining representative, they cannot be directly liable for a breach of the duty of fair representation.   As explained below, the International and Local 1433 are also not vicariously liable based on the allegations in the SAC.

### A.  The International

The Union Defendants argue that an international union cannot be held vicariously liable for the acts or omissions of a subordinate body without evidence tying the international to the disputed events.  *See Cleveland v. Porca Co.*, 38 F.3d 289, 296 (7th Cir. 1994) (concluding that union members failed to state a fair-representation claim against an international union where there was insufficient evidence tying the international to events surrounding the purported DFR breach); *see also Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 217–18 (1979) (concluding, in a case brought under the Labor Management Relations Act, that "it would be anomalous to hold that an international is [ ] liable for its failure to take certain steps in response

---

[11]     The Union Defendants object that Plaintiff is improperly amending the SAC in his opposition brief by arguing that the International approved the CBA.  (*See* Union Defs.' Reply [45] at 4 n.2.)  Even if Plaintiff had properly made such an allegation in the SAC, the court would still conclude that mere approval does not indicate that the International is the exclusive bargaining representative.  *See Borg*, 1984 WL 14332, at *3–4.

[12]     The SMART Constitution also confirms that GCAs, not the International, bargain with employers.  (*See* SMART Constitution, Article 21B, Section 85 ("General Committees of Adjustment shall have authority to make and interpret agreements with representatives of transportation companies covering rates of pay, rules, or working conditions . . . .").)

to actions of the local" where there was no evidence that the international union "instigated, supported, ratified, or encouraged" unauthorized work stoppages by local unions, because "[s]uch a rule would pierce the shield that Congress took such care to construct"). And "boilerplate allegations that a local union is an agent of its international, or *vice versa,* do not create a factual issue as to whether the international owes a duty of fair representation." *Borg*, 1984 WL 14332, at *3 (citations omitted, emphasis in original). In the absence of evidence that the International "instigated, supported, ratified, or encouraged" the alleged misconduct at the GCA level, Defendants argue, the International owes no DFR to Plaintiff. *Carbon Fuel*, 444 U.S. at 218; *see also Grant*, 627 F. Supp. at 313.

The court agrees. Based on the allegations in the SAC, the International is not vicariously liable for GCA 261's handling of his grievance. Plaintiff has not alleged that the International itself handled his grievance in an arbitrary fashion. (*See* SAC ¶ 71 (attributing responsibility to Local 1433 and GCA 261).). Instead, he merely asserts, upon information and belief, that the International "knew" about then–General Chairperson Marschinke's prior mishandling of four union members' grievances, but "failed to take timely action to correct or address this problem." (*Id.* ¶ 72; *see* ¶¶ 30, 42.) The court notes that Plaintiff has not specified whether the four other grievances were mishandled in the same way—namely, failure to timely list a grievance for arbitration. (*See id.* ¶ 30.) Regardless, mere knowledge of misconduct by a subordinate entity is insufficient to render an international union liable. *See Carbon Fuel*, 444 U.S. at 217–18. Plaintiff's allegation that General Chairperson Wallace communicated with at least one SMART-TD Vice President "about Plaintiff's situation" is similarly insufficient. (SAC ¶ 43.) Not only is it unclear when this communication occurred or whether Wallace received a response, but a single communication does not indicate that the International "instigated, supported, ratified, or

encouraged" Marschinke's misfeasance.[13]  *Carbon Fuel*, 444 U.S. at 218; *see also Cleveland*, 38 F.3d at 296; *Grant*, 627 F. Supp. at 313.  And even if there were additional communications between Wallace and the International, the SAC provides no information about the nature or content of such communication.

Plaintiff's attempt to evade these precedents by resort to general principles of agency theory is unavailing.  (Pl.'s Opp'n to Union at 3–4.)  Courts have repeatedly considered and rejected such arguments.  *See, e.g., Grant*, 627 F. Supp. at 315 (rejecting plaintiff's theory that an agency relationship between a joint council and a local union rendered the joint council liable in a DFR suit where the joint council played no role in the local's alleged breach of DFR); *Moore v. Loc. Union 569 of the Int'l Bhd. of Electrical Workers*, 989 F.2d 1534, 1543 (9th Cir.1993) (concluding that "without evidence that [the International] instigated, supported, ratified or encouraged the Local's activities or that the Local acted pursuant to its agreement with the International, there [is] no agency relationship as a matter of law").

The few cases that Plaintiff cites in support of his argument that the International is vicariously liable are readily distinguishable.  For example, in *Alexander v. Loc. 496, Laborers' Int'l Union*, a case brought under Title VII and 42 U.S.C. § 1981, the Sixth Circuit held an international union vicariously and directly liable for condoning intentional racial discrimination by a local union against African Americans seeking union membership.  177 F.3d 394, 409–11 (6th Cir. 1999).  The international was vicariously liable because the challenged racial discrimination was a product of the international's uniform constitution for locals—in other words, there was "specific evidence that the international 'instigated, supported, ratified, or encouraged' those actions."  *Id.* at 409 (quoting *Carbon Fuel*, 444 U.S. at 217–18).  The international was also directly liable because it had an affirmative duty under Title VII and Section 1981 to end discrimination at

---

[13]     Plaintiff improperly attempts to supplement the SAC in his opposition brief by suggesting that "it seems unlikely that this would have been the only such communication." (Pl.'s Opp'n to Union at 6.)

the local level.  *Alexander*, 177 F.3d at 409–11.  No such affirmative duty exists here.  Plaintiff also cites *Scott v. Graphic Commc'ns Int'l Union, Local 97-B* for the proposition that courts look to "common law agency principles" when determining the vicarious liability of an international union for the actions of a local.  92 F. App'x 896, 904 (3d Cir. 2004).  The court went on to say, however, that "[a] principal-agent relationship may not be inferred solely from affiliation between an international union and a local union."  *Id*.  Indeed, the Third Circuit held that a local union was *not* an agent of the international union, and "the allegation that [the international] did nothing despite its knowledge of [the local's] alleged discrimination and harassment is insufficient to state a claim against the International Union."  *Id*. at 905–06.

At most, Plaintiff alleges that the International failed to intervene after it allegedly became aware that Marschinke had mishandled other grievances.  But "[m]ere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union."  *Brenner v. Loc. 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1289 (3d Cir.1991); *see also Phelan v. Loc. 305 of United Ass'n of Journeymen*, 973 F.2d 1050, 1061 (2d Cir. 1992) ("An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts.").  Plaintiff cites no case law in support of his theory that payment of dues to all three union defendants is evidence that the International exercises significant control over GCA 261 and Local 1433 for purposes of agency law.  (*See* Pl.'s Opp'n to Union at 5 (citing SAC ¶ 14.))  In short, the allegations in the SAC do not support an inference that the International owed a DFR to Plaintiff, or that the International exercised sufficient control over GCA 261 or Local 1433 to establish an agency relationship.

## B. Local 1433

Next, the Union Defendants argue that Local 1433 is not vicariously liable for the conduct of GCA 261 or former General Chairperson Marschinke.  They note that the SMART Constitution vests grievance handling and negotiation duties with GCAs, not locals.  (*See* SMART Constitution,

Article 21B, Section 85.)  Plaintiff has not alleged that Local 1433 instigated, supported, ratified, or encouraged the alleged misconduct of GCA 261 and Marschinke.  *See Carbon Fuel*, 444 U.S. at 217–18.  Nor has he alleged that Local 1433 is a signatory to the CBA, or that Local 1433 held itself out as employees' exclusive bargaining representative.  *See Grant*, 627 F. Supp. at 313; *Chavez*, 779 F.2d at 1357.

Plaintiff responds that the allegations in the Complaint "point toward direct and joint and several liability of the Local in conjunction with GCA 261" because Local 1433 shared responsibility with GCA 261 for handling Plaintiff's grievance. (Pl.'s Opp'n to Union at 9.)  Plaintiff cites no case law in support of this theory of liability.  The SAC alleges that Local 1433 and GCA 261 "jointly shared responsibility for the prosecution and progression of Plaintiff's grievance" (SAC ¶ 26), but Plaintiff also alleges that the Union properly pursued his grievance through the first two stages of the grievance process.[14] (*Id.* ¶ 23.)  It was only when Marschinke missed the deadline to list Copeland's grievance for arbitration that any breach of the DFR may have occurred, and Plaintiff's own allegations make clear that this duty rested with Marschinke. (*See id.* ¶¶ 27–28.)  Plaintiff also does not allege that Local 1433 knew or should have known of Marschinke's prior lapses. (*See id.* ¶ 42 (alleging that GCA 261, the International, and CP/Soo "were all aware" of such lapses).)  Accordingly, the court fails to see how Local 1433 bore any responsibility for Marschinke's actions, let alone how it could be liable under a theory of joint and several liability.

* * *

Because the court concludes that the International and Local 1433 are not liable as a matter of law, the court grants the Union Defendants' motion to dismiss them from this suit.

---

[14]     The Union Defendants also note that Local Committees of Adjustment ("LCAs"), not local unions, are responsible for the initial handling of claims and grievances, which are then referred to GCAs. (Union Defs.' Reply [45] at 6 n.4 (citing SMART Constitution, Article 21B, Section 81 ("Local Committees of Adjustment")).)

## II.     CP/Soo's Motion to Dismiss

A "hybrid action" combines a DFR claim against a union and a breach of contract claim against an employer. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983). Because the two claims are "inextricably interdependent," an employee must show that the union breached its duty of fair representation in order to bring a claim against the employer. *Id.*; *see McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001); *Graf v. Elgin, Joliet & Eastern Ry. Co.*, 697 F.2d 771, 781 (7th Cir. 1983) ("[U]nless the union has breached its [DFR], a worker may not sue in court for breach of a [CBA].") The Union Defendants have not sought dismissal of Plaintiff's DFR claim against GCA 261 in this case, so Plaintiff's breach of contract claim against CP/Soo remains viable if Plaintiff can satisfy the requirements for a hybrid action. Defendant CP/Soo seeks dismissal on two grounds: first, that the SAC alleges only a "minor dispute" under the RLA, meaning that this court lacks subject-matter jurisdiction; second, that this suit was filed after the six-month statute of limitations for RLA claims.

### A.  Subject-Matter Jurisdiction

CP/Soo contends that this court lacks subject-matter jurisdiction over Plaintiff's claim against it for breach of the CBA because that claim is a "minor dispute," subject to binding arbitration. The distinction between major and minor disputes under the RLA is well recognized. The RLA governs the relationship between management and labor in the railway industry, *see* 45 U.S.C. § 151 *et seq*., and was adopted by Congress to avoid disruptions to the nation's transportation network by "substitute[ing] bargaining, mediation, and arbitration for strikes." *Bhd. of Locomotive Eng'rs (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 755 (7th Cir. 2018). The RLA establishes different mechanisms for resolution of labor-management disputes. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989). Major disputes involve the formation of collective bargaining agreements, while minor disputes arise out of grievances or "the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 152 Sixth. The "distinguishing feature" of

minor disputes is that they "may be conclusively resolved by interpreting the existing agreement." *Consol. Rail*, 491 U.S. at 305. Of relevance here, "[m]inor disputes are subject to compulsory arbitration" before an adjustment board. *Bhd. of Locomotive Eng'rs*, 879 F.3d at 758 (citing *Consol. Rail*, 491 U.S. at 303–04). A railroad bears a "relatively light burden" of persuading the court that a dispute is subject to arbitration. *Consol. Rail*, 491 U.S. at 307 (citation omitted).

Plaintiff correctly observes that the Seventh Circuit has not yet applied—in the RLA context—recent Supreme Court precedents distinguishing between jurisdictional requirements and nonjurisdictional claim-processing rules. *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510–11 (2006); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (declining to resolve "whether a party's failure to comply with the RLA's arbitration provision deprives federal courts of subject matter jurisdiction rather than simply defeat[ing] the claim"). In other words, it is not yet clear whether dismissal for failure to arbitrate a minor dispute should be labeled as a judgment on the pleadings under FED. R. CIV. P. 12(c), or if federal courts lack subject-matter jurisdiction entirely. *See Miller v. Sw. Airlines Co.*, 926 F.3d 898, 901 (7th Cir. 2019). But as another district court has observed, it makes no difference as a practical matter because the Seventh Circuit has blessed both options for dismissing an RLA claim. *Crooms v. Sw. Airlines Co.*, 459 F. Supp. 3d 1041, 1051 (N.D. Ill. 2020) (citing *Miller*, 926 F.3d at 901). The court's analysis below therefore applies equally to a motion under Rule 12(b)(1) as one under Rule 12(c).

Plaintiff appears to concede that his claim against CP/Soo for breach of the CBA is a minor dispute under the RLA. (*See* Pl.'s Opp'n to CP/Soo [43] at 5.) Ordinarily, that would be the end of the matter, and this court would dismiss Count I. But courts have recognized a limited number of exceptions where plaintiffs may bring suits based on minor disputes in federal court.[15] As

---

[15] One such exception is when resort to administrative remedies would be futile. *See Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 917 (7th Cir. 1974) (citing *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969) (holding that futility of ordinary grievance procedure excused plaintiffs' failure to exhaust administrative remedies, where plaintiffs alleged that

CP/Soo sees things, an employee bringing a hybrid claim under the RLA in federal court must demonstrate collusion between the employer and the union, or "that the employer's conduct somehow contributed to the union's breach." *Steffens v. Bhd. of Ry., Airline & S.S. Clerks*, 797 F.2d 442, 445 (7th Cir. 1986) (concluding that plaintiffs sufficiently alleged collusion, but dismissing the complaint on statute of limitations grounds); *see also Hoover v. U.S. Aircrew Officers Ass'n*, No. 18 C 6601, 2019 WL 3554282, at *10 (N.D. Ill. Aug. 5, 2019) (noting, in dicta, that some courts have allowed hybrid actions in such circumstances); *Rios-O'Donnell v. Am. Airlines, Inc.*, No. 10 C 6219, 2013 WL 157610, at *7 (N.D. Ill. Jan. 10, 2013) (same); *Cunningham v. United Airlines, Inc.*, No. 13 C 5522, 2014 WL 441610, at *5–6 (N.D. Ill. Feb. 4, 2014) (concluding that plaintiffs' allegations against employer did not rise to level of collusion with union), *aff'd sub nom. Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539 (7th Cir. 2014). Because Plaintiff has not alleged collusion or that CP/Soo somehow caused the Union to miss the deadline for his grievance, Defendant argues, he cannot maintain a hybrid claim against CP/Soo.

The court agrees that Plaintiff's allegations that CP/Soo was "aware" of Marschinke's prior mishandling of grievances are insufficient to establish collusion or causation. (SAC ¶ 42). Plaintiff attempts to equate awareness with complicity in the alleged DFR breach (*see id.* ¶ 51), but CP/Soo had no duty to monitor GCA 261 to ensure that it handled grievances in a timely way. *See* 45 U.S.C. § 152 Fourth (prohibiting carriers from interfering in internal union matters); *Cunningham*, 2014 WL 44610, at *6 (rejecting plaintiffs' attempt to impose "an affirmative obligation on an employer to supervise unions"). And regardless of whether a settlement occurred between CP/Soo and the Union on Plaintiff's behalf (*see* SAC ¶¶ 39–41), settling a grievance is insufficient to establish collusion. *See Bryan v. Allied Pilots Ass'n*, No. 17-cv-12460-DJC, 2018

---

employer and union agreed to exclude them from higher paying jobs on the basis of race). This exception is available only when the grievance process or the arbitral board is so biased against a plaintiff's claim that it cannot succeed. *See Cunningham v. United Airlines, Inc.*, No. 13 C 5522, 2014 WL 441610, at *6–7 (N.D. Ill. Feb. 4, 2014). Because Plaintiff has not alleged such facts or invoked the futility exception in his brief, the court need not address its applicability here.

WL 6697681, at *7–8 (D. Mass. Dec. 19, 2018) (concluding that plaintiff failed to allege collusion where plaintiff did not allege that employer acted in bad faith by entering a global settlement agreement).

Plaintiff responds that a different exception to the rule precluding federal jurisdiction over minor disputes applies to his suit. In *Childs v. Pa. Fed'n Bhd. of Maint. Way Emps.*, 831 F.2d 429 (3d Cir. 1987), a railroad employee sued his employer and his union, in part because the union had agreed—at the employer's request—not to introduce new evidence in support of his grievance before an adjustment board, thereby dooming his grievance. *Id.* at 431–32. The Third Circuit announced a new exception to mandatory arbitration of minor disputes "where the union effectively eliminates this option and frustrates the federal administrative remedy, [because] fairness to the employee and fidelity to the underlying goals of the RLA mandate that we grant the employee a forum in federal court." *Id.* at 441. The court did not conclude that Childs himself qualified for the exception, but instead remanded the case for the district court to make that determination. *Id.* at 441. The court also cautioned that the exception it recognized was "a narrow one and cannot be interpreted as undermining the general rule of exclusive [arbitral] jurisdiction for minor disputes." *Id.* CP/Soo argues that the *Childs* exception has not been recognized in the Seventh Circuit, and even if it had been, this case is factually distinguishable.[16]

The court agrees that the *Childs* exception, if read as broadly as Plaintiff suggests, would undermine the general rule that minor disputes do not belong in federal court. Even if this court were to adopt an out-of-circuit exception, Plaintiff has not alleged facts suggesting that CP/Soo

---

[16] According to Westlaw, the Seventh Circuit has never cited *Childs*, and only one district court within the Seventh Circuit has done so, in a footnote. *See United Transp. Union v. Ill. Cent. R.R. Co.*, No. 97 C 7962, 1998 WL 258470, at *3 n.1 (N.D. Ill. May 14, 1998) ("Courts have formulated exceptions to the rule granting exclusive jurisdiction over minor disputes to the [National Railroad Adjustment] Board, but these exceptions are not implicated by the facts of this case.") (citing *Childs*, 831 F.2d at 437). Plaintiff argues that this citation means the Seventh Circuit has "taken notice of [the exception's] existence" (Pl.'s Opp'n to CP/Soo at 8), but as the quoted language above makes clear, no court in this circuit has passed judgment on the validity of the *Childs* exception itself.

played any meaningful role in his inability to obtain relief before the PLB. In *Childs*, the employer expressly conditioned an extension of time for the union to prepare for arbitration on the union's agreement that it would not introduce new evidence, and the union conceded that such evidence was essential for the grievance to succeed on the merits. *Childs*, 831 F.2d at 431–32. Plaintiff, by contrast, has neither alleged that CP/Soo imposed a condition that sealed the fate of his grievance (aside from the terms of the CBA), nor that the union agreed to such a condition. The court concludes that the exception recognized in *Childs*, if available at all, does not apply on these facts.[17] Plaintiff has also not alleged collusion between CP/Soo and the Union Defendants. Accordingly, Plaintiff cannot maintain a hybrid action, and the court grants CP/Soo's motion to dismiss Count I.

### B. Statute of Limitations

Because the court concludes that Plaintiff's claim against CP/Soo fails on the merits, it need not reach CP/Soo's alternative argument that Plaintiff's suit is time barred. *See United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1269–70 (7th Cir. 1985) (concluding that a six-month statute of limitations applies to breach of DFR claims under the RLA); *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999) (holding that the statute of limitations starts to run when an employee knows, or through reasonable diligence should have known, of union's actions constituting the alleged DFR breach). The court notes, however, that it is not clear that a timeliness challenge can doom this case at the Rule 12(b)(6) stage. *See, e.g., Thornton v. Hamilton Sundstrand Corp.*, 2012 WL 1966022, at *3–4 (N.D. Ill. May 31, 2012) (St. Eve., J.) (denying motion to dismiss on basis of the statute of limitations because the motion raised factual questions that could not be resolved at the pleading stage); *Gosselin v. First Trust*

---

[17] With respect, this court is uncertain that the exception recognized in *Childs* was necessary for a just result. It appears that the employee's claim would have failed regardless of any agreement between the employer and the union because the adjustment board's own rules prohibited consideration of evidence that had not been submitted to the employer prior to arbitration. *See Childs*, 831 F.2d at 431–32.

*Advisers L.P.*, 2009 WL 5064295, at *8–9 (N.D. Ill. Dec. 17, 2009) (denying motion to dismiss on basis of the statute of limitations where defendants' characterization of plaintiffs' knowledge sought to contradict allegations in the complaint).

Without the benefit of discovery, this court cannot determine when Plaintiff had the requisite knowledge to trigger the statute of limitations. Specifically, the SAC alleges that the Union timely pursued Plaintiff's grievance through the first two stages of the process outlined in the CBA, with no indication that the Union had decided not to list his grievance for arbitration, and that Plaintiff had repeatedly requested status updates but was assured the grievance was proceeding on schedule. (SAC ¶¶ 21–23, 45–46.) A reasonable person in Plaintiff's position may not have realized that Marschinke missed the deadline to list his grievance for arbitration by eight months (*see id.* ¶¶ 28–29), particularly where almost twelve months elapsed between the time that Marschinke ultimately listed the grievance for arbitration and the date of the PLB's decision. (*Id.* ¶ 36.) Because CP/Soo's motion is being granted on other grounds, the court declines to comment further on the timeliness objection.

## CONCLUSION

For the foregoing reasons, the Union Defendants' motion to dismiss [36] is granted, as is Defendant CP/Soo's motion to dismiss [38]. Defendant GCA 261 shall file an Answer to the Second Amended Complaint within 14 days.

ENTER:

Dated: September 7, 2021

REBECCA R. PALLMEYER
United States District Judge